Please step up and identify yourselves. Gregory Silverman for the appellant plaintiff in the underlying case. Vincent Cassari for Chicago Park District and West Trek. Can you guys know our basic 1515? If we ask a lot of questions, we give you leeway, but don't take that you're going to be here at 1 o'clock this afternoon. All right. Thank you. Proceed. Thank you so much, Your Honor. Regarding the issue of duty, there are four factors to consider. The foreseeability, the likelihood, the magnitude of the burden guarding against the hazard, and the consequences of the burden of guarding against that hazard. It is certainly foreseeable when you're operating a waterfront facility like the Marina Park that a child will fall into the water. That's what happens when children are around water. It's not a question of if they will fall into the water. Eventually, children will fall into the water and risk injury. The hazard here is having no life jacket on the child. Not the water. The water is there and it's always a hazard. That's acknowledged. But the difference in this case is that the child was not wearing a life jacket to help him stand up. Whose duty is that? What we assert, it is the duty of the facility, the operator and the owner of the facility. And at most entities, including where I swim every day, no kids under 12 years of age are allowed in a pool without an adult supervising them and watching them. One. Two, if they go into the outdoor pool, they're not allowed. So my simple point is, if you're going to have this thing, why wouldn't you put it on immediately if you bought it? The parent, the father, bought one of the higher end life jackets. But he didn't put it on. He did not put it on him when he was on the dock because he's a new boater. He's new to the Marina. He's not aware of the hazards of children walking around on the docks. Come on. Let's get, you know, move on. Don't give me conclusionary statements. Okay. Counsel, is there anything in the record that indicates the dimensions of this dock? Nothing to indicate the dimensions, Your Honor. Nothing at all? We're talking about a wooden dock? Wooden docks, yes, sir. All right. And how long have the parents' counsel been docking? A year. Just a year? Yes, ma'am. So they've had occasion to be at this particular harbor on more than one occasion? Yes, ma'am. How many would you say? How many times? I know this was Father's Day and it was particularly eventful. I don't know the answer, so I'm not going to just throw something out there without a basis for saying it. But this was not their first time on this particular dock? No, this was not their first time, Your Honor. Thank you. Counsel, is there anything in the record that indicates what the dock looked like on the day that this happened? In terms of there being, you know, there was some deposition testimony about hoses and... That is the extent of the information as to the condition of the dock. And, Chair, as you know, it's Father's Day. There's a lot of commotion on the docks. It's a family day and a lot of stuff gets strewn about, ropes, things they're taking onto the boats, and that's all over the dock area where they're boarding, which is where the child was at. Could either of the parents swim? Yes, both parents could swim. That's not what the record says. Oh, the father held onto the rope when he jumped in. The father could not. The mother could, I think. The defense raised a couple cases in their reply brief, and they are in opposite of the facts of this case. They cite Coke, which involved a water recreation pond outside of a housing complex. The difference with the facts of that case, the complex did not charge for use of the pond in that area. It was open to everyone who was... It's open to the public. It's not gated. It's not guarded. Everyone has access to it. The pond is not controlled or maintained, such as the dock was, or even a pool. That's the difference between a pond and a controlled space, a controlled environment. No one was maintaining the pond. It's a pond, and it lets retention water, and kids swim in it. In the winter, it ices over. They play hockey on it. But the pool is used for exclusively recreational purposes. It's not used for retaining water or any other purpose. Solely recreation, just like the dock area in the case before you. And open and obvious does not automatically exclude liability to a child. You have a burden to mitigate the danger. That burden is not outweighed by the risk of injury to a patron, and certainly a patron who is not wearing a life vest, as is the situation in the case of Barb. They cite Jackson, which concerned a hazard from a submerged pipe. Here, the hazard was not just the water, but the lack of vest. And there was nothing submerged. There was no hidden hazard that no one knew about. The facts of a submerged water pipe are not really on point with whether or not he should have been required to have a life vest when he was on the premises of the dock areas. They also cite T.T. by B.T., and that's where a child could not appreciate the danger of a tarp over a pool. Excuse me. We cite that as similar to not appreciating the safety concerns of having a vest on a child when they're on the deck. There is no water on the deck. The hazard is below the deck and on the sides of the deck. Open and obvious liability arises from the knowledge of the possessor of the land of what is foreseeable when children are present and if the risks outweigh the burden of removing the hazards and the dangers. Open and obvious does not end duty when it is foreseeable that children will encounter the hazards on this property. Joe Williams, the manager for the property maintenance, the operator of it, he knew children should wear life vests when they were on the dock. He would comment to them when he would see them. But, Counselor, so did the child's parents. Otherwise, they would not have gone through the trouble of buying the high-end life jackets, which were where at the time? On the boat. On the boat. Pursuant to the federal law, you've got to have life vests for everyone on the boat. But there's no law that would preclude the parents from placing or putting the life jackets on the children prior to? Oh, certainly not, Your Honor, in retrospect. So the parents knew of the danger as well? They were aware that the piers are surrounded by water and their kid is afraid of water and can't swim and they knew he didn't have a vest on him because they didn't put it on him because it was on the boat and they had not gotten to their boat yet. The child was afraid of water? He was afraid of water. And yet he was allowed to toggle between the piers? The two parents on either end of the dock. But he was afraid of water? But he was afraid of the water. And the parents were aware? They were aware he was afraid of the water. Counsel, the one thing that I find difficult is proximate cause. You need to address that in order to help us because the conclusionary allegations of the affidavit does little to help us. So you need to give us something in proximate cause. Okay, and the proximate cause all goes back to tripping over that rope that was thrown on the pier. That's conclusionary. We don't know that. It is an observation and a conclusion is drawn from the observation that the father made. If a rope, if a heavy rope is strewn across an area and it will naturally curve and wrinkle and lay upon itself, when someone's foot catches on the rope, the natural path and soft curves and lane of the rope is altered because you have a natural transition. Counsel, that's all well and good, but it is not based in fact. The father observed what he saw as the rope was not laying as it would if it was normally thrown. It looked like it was pulled by a foot. And that is our, that is the evidence we have as to what caused the child to fall into the water. No one saw him fall. So you don't have a basis in proximate cause established at this point. You've got to give us more. All we have to present to the court is the appearance of that rope that was laying on the deck at the father. And you know what the case law says in that situation. I do, Your Honor. So it's not, it's possible, but it's not necessarily probable. More probable is the child lost his toy, it fell in the water, and he reached to get it. But we don't know that. We do not know how he went into the water, Your Honor. And I argue that there is more likely than not that the father saw a rope that he felt was pulled and disturbed by a foot. To him it appeared the rope was pulled by a foot. That's our evidence for proximate cause, Your Honor. And this rope was so, I'm sorry, Justice. No, I understand what he's saying. I'm sympathetic, but I'm looking for that added inch. So the parents are how many yards apart from each other? That is not in the record, Your Honor. At either end of the dock, though. One's at one end talking to other boaters, and the other one's at the other end talking to other folks on the dock. Do we have any factual basis in time that they were separated? No time frame. Are we talking about the distance in this room from one end to the other? Or are we talking about the distance from me to you? I mean, both of those could be measured in yards. It's more the distance of the room from you to the back wall there. I see. And this rope is obviously stolen. And that's not in the record, Your Honor. I just say that because I've been to the dock, and I know what they look like. I see. But it is not in the record. And is there anything in the record that indicates what else was between the two parents? Were there a bunch of ropes and hoses strewn about? Were there lawn chairs? Were there? The testimony on the record is that there was various items strewn about the dock. Was there? There was lawn chairs and ropes. When you yourself were there, although this was not in the record, was there any evidence of damage to the deck? No, the deck appears in good condition. Counsel, is there anything in the record? And I don't believe that I saw anything. But is there anything in the record to indicate that the rope was in a different position after the parents noticed the child was missing? No one saw it before. No one saw the rope before? No. So we don't know what condition or the location of the rope or the shaping of the rope prior to discovering the child? No, Your Honor. But it is the way the rope is laying on the ground that is indicative that something happened to alter the way the rope was naturally laying by whoever placed it there and threw it there. It was just the way the rope was laying, the father, and I already went through this before the court, the way he saw it, it looked like it was pulled by someone's foot or something pulled it to the side. I don't have any further argument to make, Your Honors. Nothing further on proximate cause? I have nothing further to offer on proximate cause, Your Honor. All right, I thank you. Thank you. Good morning, Your Honors. May it please the court, Vince Kacseri for West Trek in the Park District. I do want to just point out, judge, jumping in a little bit out of order here, there is testimony in terms of the distances at the time of the accident. I took the depositions of both parents. Mr. White, the father, testified that the child was 7 to 10 feet away from him, running away from him the last time he saw him. Running away? Correct. He was going to his mother on the other end. So according to Mrs. White, she was approximately 20 to 25 feet from Mr. White, if I remember correctly, that testimony. So we have them separated by approximately 25 feet. We have Tyrone III in between them, 7 feet away from the father, so approximately 18 feet from his mother. What can you tell us more about the rope that's alleged? With respect to the rope, judge, the testimony is clear from Mr. White. There's nothing from Mrs. White. She has nothing to add. She didn't see it or anything like that in the area. Mr. White said that... When they say a rope, describe what they're talking about. I mean, is this a rope that anchors the boat? Yeah, it's the thicker, twined, brownish rope that you use to... Hold it to the deck. Right, correct. The father said that the rope was across the dock, lying into the water. It was something he did not see his child kick. Approximately 2 feet or so was laying in the water. He said it was unkempt, and that was about his description of the rope. He said that it looked like it had been kicked. But I also asked him if it could have been thrown in that spot and sat in that spot in that condition, and he said yes, that's true as well. He did not see the condition of the rope before he noticed it after the child went in. So he can't testify that it was in X position first and then in Y position second, which would, I think, give us some basis to say that there is evidence that the rope was touched by the child. He basically saw the rope for the first time after the child had disappeared, and at that point he described it as being unkempt. As far as I'm aware, these ropes are not new and pristine, so he described a dirty rope that was laying into the water about 2 feet in. And this rope was, I think, about 10 feet away from him, and as he got closer he didn't describe anything different about the rope because his focus was obviously in the lake. So that's all we have, and he was clear about it. Was there any testimony about any obstructions between them? No. Anything that would possibly imply that the child would have had to go around something and get closer to the edge of the dock? Yeah, I did ask those kinds of questions, and the only thing that's in the record that, according to Mr. White, who was the only person that potentially could have said anything at this point since there were no witnesses, is that that rope was there. Now, is there testimony that the dock had other items on it? Yeah, it was Father's Day. The police officer testified the dock was fairly clear, but obviously that's not terribly clear. We're talking also about signage. What signage is, I know there's a federal reg, but besides the federal reg, is there any postage as to wearing of certain items? Not on the gate to the dock area. There is nothing that says you are required to wear life vests, as they're alleging. We don't have that sign. But as Your Honors noted, our argument in this case is that since Mr. White not only bought new vests, but he had four vests in the boat when he bought it a year prior. He researched them online, bought six new ones because he researched ones that were better for children. He specifically said that. Because he had that knowledge, our argument is a sign, not only would it still be burdensome, but the sign in that presence would have made no difference because he had that requisite knowledge. The sign would not be there for the purpose of the child, obviously. So having the sign there, again, in terms of proximate cause, would have had nothing to do in this case because Mr. White was seasoned, relatively speaking, and he had knowledge of what the purpose of these vests were. He wore them himself. He actually, the child, and Justice Cobbs picked up on the point that the child was afraid of the water. He was because he had taken swimming lessons. He did not swim, but he had taken lessons, according to his mother, at the Y, with a vest on. So he understood, presumably, even at five, I think he did because he was afraid of the water. So he understood the reason for the vest. He understood the danger of the water. He was afraid of it. This is not a two-year-old toddling across, which, in any event, if it was, there is case law that repeatedly states it's the parent's duty to watch a child. The duty argument is what's reasonably expected from my client. A counselor talked about the foreseeability of someone drowning. That's not the test. There's case law, Salami, for example, S-O-L-L-A-M-I, that had to do with a trampoline. They talked about the trampoline manufacturer being potentially liable, and the Supreme Court stated that the fact that Eaton, the trampoline manufacturer, may be aware that teenagers use the trampoline and may injure themselves while performing maneuvers does not translate to a legal duty. The legal duty that Your Honors are very aware of has to do with the reasonable expectation of my client that not only is there going to be a child in the area, but that he will be unattended. And in this case, there's no reasonable expectation because we're not talking about a recreational facility. And they keep bringing that up in their arguments. This is not a playground. This is not a... There's no place there for swimming. No, this is not a swimming hole. Okay, I play golf out there, but I've never swam. No, this is an area, as Your Honors know, this is an area where boats are... West Trek Harbor, you pay a fee of several thousand dollars a summer to keep your boat there. They take care of the boat. They don't provide access to come out and swim in the lake. They don't provide any payment for that. They don't require any payment for that. So for them to presume that a child will be unattended is ridiculous here because this is an area where there are boats. Not only that, this is an area where boaters access. Do you think the defendants owe a duty to keep the dock and the harbor reasonably clear of clutter and ropes and things like that? I think that's reasonable. I think they have maintenance personnel. Mr. Williams testified to that. I don't think that that's an unreasonable expectation that at least within reason... Now, it is the boat owner's responsibility. Anyone that is a boater, I'm told, I don't know this myself, but boaters are responsible for anything they use to tie off and keep that area clean. However, this is an area managed by West Trek, and they indicated in testimony that they would walk through, and if they saw debris, they would tell folks to kind of clear it up. They didn't have guards posted. They didn't have maintenance personnel standing around all the time. Their maintenance really was to fix any defect on the dock or, more importantly, to assist boaters. Well, how would you define the duty that they had with regard to keeping the dock? How would you put it in your words? I would say that the West Trek's duty would be to keep the dock area and the dock surfaces reasonably clean and free of obstruction for people to walk. How would you define a rope? Where does a rope fit within that definition? Well, part of the argument is that the rope is the responsibility of the boater, and we don't have any evidence here that there was a significant problem with ropes being laid everywhere. This could potentially, according to the record, be one instance where there was a rope laying. I'm not saying we're that perfect, but from the evidence in the record, there's no substantial indication that there's notice to West Trek that these ropes posed a particular problem such that they would have to maybe do something different. Now, are there going to be busier times where maybe they have to be more careful? Potentially, but in general, ropes themselves are everywhere. They're the responsibility of the boater, and according to the testimony, reasonably speaking, the areas were kept generally clean. Even Mr. White acknowledged that for the most part. He saw West Trek guys going around. He saw that they would police the area for that. So this rope, and of course there's the proximate cause argument, but in terms of a duty for the rope, the rope could have been laid there by the boater five minutes earlier. We don't really know that. And absent evidence of some kind of notice in that regard of a particular hazard with these ropes, I don't think there's any duty with respect to this rope, assuming that this rope was the cause of the accident, which of course we're arguing absolutely was not. Counsel, I just want to make the argument that had there been adequate safety equipment there that attempts to save this child might have been successful. Was there a duty? Is there a duty? Are there ladders there such that someone? In the particular area of this, these are finger docks, so the dock area comes off. So if the lakefront is here, the dock area will come off here, and then there'll be a star dock coming off of that finger, and it'll sort of like my hand. This is the main dock, and then there are docks that come off. So according to the testimony where this occurred was in this area here, there was no ladder in between these particular docks. These are where the boats come in and access. There are ladders down here for access for people who need access. I'm not even sure what those ladders are for. That's what the testimony of Mr. Williams was. I don't believe there's any further duty to have ladders. Ladders are mostly for scuba divers, for emergency access. Again, there's no reason why people would go into the lake for any particular reason, off their boats or otherwise, so the ladders are there primarily, according to the testimony, emergency personnel. In this case, according to the evidence, the child disappeared immediately, and I think a reasonable inference can be made by Your Honors that he disappeared immediately. There's some evidence that the water was murky and was not clearly visible, and I understand that in some places they put stuff into the water to kill the grass that grows, but what is your response on that as to the condition which the brief states? I think the testimony of that in the brief came from the one expert, Mr. Smith, who conclusively states that there was a current. The police refer to a current. According to people I've talked to, including the harbormaster there, there's always a current in that area. It's just the way the lake is. There's no proof that current had anything to do with this child's drowning. In fact, it's overwhelmingly likely the minute he went under the water, he was gone, because if you don't know how to swim, you're going to be pretty much gulping water at that point. There is no evidence there was an excessive current. There potentially was a current there. There's no evidence, Your Honor, about anyone putting anything in the water to make it clear that I know of, but I also am not aware that the water was any more murky than it normally is on any particular day, when you go out there today or next month. The particular murkiness of the water really didn't come up in the case. The proximate cause has absolutely nothing to do with it, because, again, the child, nobody knows how he went in, and presumably the minute he went in, he was gone and nobody found him. The police mentioned a current in the context of where they found the child. He was up against a post, kind of pretty much straight down the dock area. So what apparently happened is he went under, and then the current must have moved him. But, again, there's no indication the current was either unusual, or that it moved him away such that nobody could find him. I mean, this presumably could have happened with these conditions any day of the year. And, again, there's no evidence that anything with respect to the current should have been known to West Trek to have done something different than they already did. They had life rings. There were buoys and life rings in the area, but that would presume that the child would have been visible to be able to get him a life ring. He was never seen, so I don't know what good a life ring would have done, but they were there. So I think in terms of the duty from the harbor's perspective, that satisfies it. The ladders where they are, as I described, and those life rings. And, again, I think Your Honor's mentioned this already, that the expectation from West Trek would be that children would be attended to, because there's boaters, because they know they need vests, and if they're unattended, that the presumption should be that they would understand the obvious nature of the danger of Lake Michigan. Repeated cases. Culp, I think, is directly on point. Talk about a seven-year-old. Kristen. Bucheleros. These cases talk about younger people, sometimes within the decedent's age, sometimes even younger, being able to appreciate bodies of water as dangerous. And I think it's clear, since he was afraid of the water, that he could have and probably did appreciate that. So I think the underlying court was correct. But if he tripped or slipped, then he didn't fail to appreciate the water. He just tripped and fell into the water. Some of these cases, Bucheleros, that's how you pronounce it, those people jumped off a piece of concrete into Lake Michigan knowingly. Several of these cases were like that. Mount Zion, Cope, they didn't jump, but they certainly put themselves in a dangerous place. If you believe the plaintiff's theory of the case, I know you don't, but if you did, he would say, well, he wasn't jumping into the water. He wasn't saying, oh, I think I can swim now, I'm going to jump in. He tripped. It was an accident. And so there may not be a duty to warn, but I think that if you look at the factual theory that they're putting forth, I think it's a little bit of a red herring to talk about whether he did or didn't appreciate the danger of the water. Two points to that, Your Honor. The first is that the issue of proximate cause. We're presuming he tripped for the purposes of this discussion hypothetically. Right. I'm going to do that hypothetically. There's absolutely no evidence he tripped. But I think it's even more likely that I don't, I mean, to be honest with you, many other options are possible. He could have dropped the toy and tried to maybe reach and get it. I believe the evidence is he was cautious, would have been cautious, because he was afraid. So if we have the fact that he's afraid, I agree he probably didn't take a dive into the lake purposely. But he could have maybe tried to reach for the toy. Maybe his foot slipped off the edge. Who knows? But with respect to duty, I think the reasonable expectation would be that if he is in that area, however he gets in the lake, he is going to have protection on him because the parents will put him on it. Whether he knows to put it on himself, the parents are required. And there's several cases that we've cited, too, as well that talk about parental responsibility here. You're putting a burden or a duty on the lakefront manager that the parents ostensibly have to have. If he really didn't appreciate the risk or was too young, then he's a child of tender years, and there's case law that talks about, you know, that those, if they're unattended, it would not be reasonable to expect that they should be. There's a couple of cases that people bring their children to a friend's house, and they drown at the friend's house, and they sue that owner of that house. I think Mann and Spencer is one in England. And the courts have repeatedly stated that the duty is the parents at that point, if the child really, you know, can't understand what's going on, to make sure that child is secure, not the manager or owner of the property. And I think requiring, if the argument is that we are to require every person of that age to wear a vest, I don't know how that would be implemented. I think the burden in the duty analysis, the burden would be significant at that point, because then I'd have to decide, okay, what age? How do I check the age? Do I have to have a guard posted? And West Trek, you know, there's 22 harbors, I think, up and down the lake. This is just this city. So I think Bucoleros talks about the burden of having the park district warn every inch along the lake not to dive in. It's just not something that's reasonable. Since neither of you cited, are you aware of any situation where there are signs posted like that? That's kind of a big question. Like to require to wear a vest in a management scenario like this? Interesting that that's brought up now, because it was not brought up by the expert. I'm not aware of anything like that. I would have assumed the expert would have said, hey, in Detroit or in San Diego where these harbors are, they have signs. This is the industry standard. You need a sign that warns people not to, or you need somebody there to check ID. But there was nothing like that other than the conclusory statement that he should have had a, if he had the vest on, he wouldn't have drowned, and we should have required him to have the vest. So to your point, I don't know of any case law or any federal or state requirement that says these signs have to be there or that managers of harbors have to require children to wear vests. I guess that would be nice, but not reasonable. Can I take you back to proximate cause for a second? Sure. There's a case, Jackson v. TLC Associates. I think that this has been cited by the parties, I would imagine. That's how I came upon it myself. This is a case where somebody jumps off of a high cliff in a recreational water area, hits something on the bottom, becomes quadriplegic and later dies. The evidence shows that he could have hit the bottom of a maybe surprisingly shallow part of the water, or he could have hit a pipe that was floating. Right? You remember this case? Right. And there was a duty question there, but on the issue of proximate cause, the individual ended up dying. I don't think they got his testimony before he died. And so essentially nobody knows what happened. Nobody knows whether once that poor child went under the water, whether he hit a rocky bottom or whether he hit the pipe. The difference between those two things could be the difference between liability and not liability for the defendants. But the Supreme Court said, even though there was nobody to testify to it either way, and they acknowledged that, they said that summary judgment on proximate cause was improper. If I remember correctly, Your Honor, in that case, I thought there was some evidence more so leaning toward the fact that there was this pipe because there was a pipe down there that he probably would have hit, more likely than hitting the lake bottom. And I think also in either way, in either situation, I think the court commented that ultimately you have these two reasonable possibilities, both of which in that case were the responsibility of the landowner. In our case, you don't have equally reasonable probability of other things happening here. You have a guess that he hit the rope. You have a guess that he fell in going for his toy. And you have a guess, arguably, that he jumped in. Again, I would agree that he probably didn't do that. But you have a guess as to whether the hardware somehow contributed in the condition of it. It's completely guesswork. In this case, in that case in Jackson, I think it was slightly more narrow in terms of the possibilities that could have been there that were reasonable to have occurred. I think that was the distinguishing factor. And in this case, I think it's complete guesswork, even by the child's own dad who just never saw this condition of this rope beforehand. So there was nothing to compare it to. He just says it's a dirty rope laying there. You're basically requiring the jury at that point to guess on a situation that's crucial.  All right, thank you. Thank you, Your Honor. Thank you. I'll keep my reply brief. There was a husband and wife couple that witnessed the boy's hands and head go up and down in the water, and then they did not see him again. If there was a ladder there, they would have gone down the ladder to get the child. And there were other witnesses. There's testimony in the briefs that people looked around and could not find any assistance devices to help rescue the child. They didn't see any of the buoy rings. They didn't see a ladder to go down. That one couple saw the child in the water and he disappeared, but there was nothing they could avail themselves of to render assistance to the child. And the briefs say that there were several people that jumped in the water to go after the child. So attempts were made, but there was not a ladder to provide immediate access and access to lift the boy up and back out to the dock. So if someone was lucky enough to put their hands on him, well, then he'd get in too hard to get him back on the dock. But people could form a chain and link up to get a kid up to the dock if that's the situation, but no one got their hands on the boy before he disappeared and no one saw him again before his body was found. So people were looking to assist the child when he went off the dock, but there was nothing anyone could do. That's all I have for my reply. Thank you, Counsel. Thank you very much, Your Honor. You both argued very well for your clients. We'll review it and see what we think. Thank you.